Case No. 19-1025.L, Mapleton 1050, Inc. v. D.A. Mapleton Cadillac of the 30 mil Petitioner v. Labor, National Labor Relations Board. Mr. Campbell, Petitioner. Mr. Campbell, Respondent. Good morning, Judges. May it please the Court, my name is Tae Young Kim, and with my partner, Michael Patrick McCart, Sr. We represent the Petitioner in this matter, Mapleton 1050, doing business as Mapleton Cadillac of Libertyville. The NLRB erred by adopting and affirming three procedural rulings and three substantive rulings by the ALJ. For the procedural rulings, the Board went against its past precedent and did not offer any reasons for why it was diverting from those rulings. First, the sequestration of our lead attorney, Mr. Hendricks, because he was going to testify at the trial goes against the Board's ruling in Greyhound Lines, which allows witnesses who will testify at the hearing to stay in the hearing room if they are essential to the case. As lead attorney for us, he is obviously essential to the case. And the second procedural error, it was not allowing Mr. McCart to retain the witness at the hearing. Well, Mr. McCart said that they were both going to represent our client, Mapleton. The general counsel's brief that state, pre-hearing brief before the ALJ, said that McCart represented that he would serve as Respondent's Counsel at the hearing. Okay. Because Hendricks was a prospective witness, and I didn't see you denying that in your briefing to the ALJ. Well, we don't deny that Mr. Hendricks was going to be the, I guess, the witness in the matter. And, no, the key language here is that McCart said that he would serve as Respondent's Counsel at the hearing. Correct. Okay. So then Mr. Hendricks was not the lead counsel, as you had said? He was the lead counsel negotiating with the union and the Board. Oh, but not lead counsel for the hearing. Not lead counsel for the hearing. I'm sorry, I misunderstood. My apologies. I made a mistake of judgment. Mr. Kent, did you allege that there was any prejudice from these procedural errors? Yes, we did. In your opening brief? I believe we did. And what was that prejudice? Mr. McCart had tried the case on his own. He was unable to, I guess, one, properly look at the witness affidavits, two, handle the subpoena issue that we will discuss. And NLRB hearings are trial by fire. There's no pretrial discovery. And with Mr. Hendricks, the lead attorney, as far as the negotiations with the union part, Mr. McCart did not have that information squarely with him in front of him. So he had to deal with all that by himself. That just caused some prejudice. But you just agree that he went into the hearing planning to be the lead counsel? Correct, with Mr. Hendricks providing him the information on the facts that he was going to discuss. But being sequestered as a witness doesn't mean that you couldn't speak to him to get any, ascertain any facts that he needed. Sure, I understand that, Judge Wilkins. But Mr. Hendricks not being in the courtroom while the other witnesses were testifying, he is missing out on the facts of the case of the history that he lived through. So he's not sure or doesn't know what's being said or what the witness was testifying to. So in a sense, that leaves us fighting a case with one hand tied behind our back. So that's the prejudice there. The board doesn't mention that they had two attorneys with them as well, and the union had one attorney with them. So it's essentially, if you want to call this three, it's one at that time. And the second issue I wanted to address procedurally was the affidavits. The ALJ did not allow Mr. McCart to retain the witness affidavits throughout the hearing, which goes directly against the board's own ruling in Walmart. Walmart states that the counsel, not the ALJ, has the discretion whether to keep the affidavits throughout the hearing. To repeat Judge Rao's question, how were you prejudiced? Well, as one attorney, Mr. McCart gets the witness affidavits, and he has about 10, 15 minutes at the most to look over the witness affidavits and do a cross-examination. Well, that's got nothing to do with retaining it. The issue here was whether they could retain it after the cross-examination. You're not challenging the rule on the timing of when the affidavits are released. Well, no, we're not challenging when they're released. We're challenging the fact that Mr. McCart has the right to retain them throughout because that affidavit can also be used to cross-examine a different witness. So where's the prejudice? Which witness were you not able to cross-examine because he didn't have the affidavit? Well, that's something we really don't know at this point, Your Honor. We just didn't have that information in front of us for much longer than 15 minutes. As far as we could have cross-examined Mr. Cincinnati, which I'm sure the affidavits of Mr. Shu Cagle and the other plaintiffs or the respondents in this one, I'm sorry, the plaintiffs in the matter, we could have used that for a cross-examination of other witnesses. We just didn't have the ability to do that. And that ruling just goes directly against the Walmart ruling. And as far as the subpoenas, the boards ruling in Midland National Life Sciences and McAllister Towing say it is a violation to dishonor a board subpoena, and that is exactly what Mr. Shu Cagle did. But instead of placing any sanctions on Mr. Shu Cagle or applying a preclusion rule, the ALJ and the board affirmed Mr. Shu Cagle to introduce and testify evidence on the very subpoena topic that he dishonored. That is clearly a violation. And as this board stated in Fort Dearborn v. NLRB— Do you think that toolbox would have been allowed into the courthouse? Well, the issue is not whether the toolbox— Do you think the toolbox—I'm just asking— No, there was no way we could have brought the toolbox within the courtroom. But the fact is that Mr. Shu Cagle was served with the subpoena 14 days prior to the hearing. We heard nothing from Mr. Shu Cagle, his counsel, the union, or the board as far as offering an accommodation. Were any of them served with the subpoena other than Mr. Shu Cagle? I'm sorry, I didn't hear. Were any of them served with the subpoena other than Mr. Shu Cagle? That I don't know of. Well, that would probably explain their silence. Well, I mean, the union, the board, and Mr. Shu Cagle are all working together on this. The board called Mr. Shu Cagle as a witness. Why did you issue a subpoena for something that you knew couldn't possibly be brought into the courthouse? Well, it's not necessarily that it couldn't be brought into the courthouse. That's not to issue judges. They never offered us an accommodation. They never contacted us. The only way we found out that the subpoena was not complied with was when we showed up to the hearing that day. They could have called us and said, you could come expect the tool box at a neutral site. They could have brought the tool box in front of the courthouse and we could have inspected it there with the ALJ. The ALJ offered those kinds of things, right? They didn't offer us any of that. I thought the ALJ said that you could go inspect it if you needed to. Correct, but then he did take the testimony of Mr. Shu Cagle over our objection. But you could have inspected it during the hearing time? We could have, but then now we have the problem of Mr. McHarg trying to case them by himself. So it's kind of a circular argument, but then we have one man trying to case versus three, and he's going to go inspect the tool box after five and show up right at the courthouse the next morning. So with these rulings as stated in the Fort Dearborn that go against the board's precedent, without an explanation of why they're diverting from the past precedent, as stated in the Fort Dearborn, is the definition of arbitrary and capricious. Now moving to the procedural issues. When the board affirmed the unlawful surveillance violation, Member Emanuel and Chairman Ring noted that their decision today was not unanimously accepted, and they cited an Eighth Circuit case called Greater Omaha, which I think is key here because the facts are very similar. In Greater Omaha, we had two employees who were being terminated, and while they were being terminated, the employer said, I know that you two are the ones who started this, and this is being union activity. The court in Greater Omaha stated that there was no unlawful surveillance because that statement made while those two employees were being terminated could not coerce or restrain their pro-union activity. Thus, there could not be any unlawful surveillance. And that is exactly what we have here. When Mr. Inman told— But that's not the argument you made in your exceptions to the board. I mean, we tracked down your brief, and all you said was the statement was ambiguous. And so it couldn't be deemed surveillance. And so I don't see how that puts—you didn't make the argument before the board. It seems to me that you can't make a new argument here, that under our precedent and under rule 10E, I guess it is, it's forfeited. Well, I believe we made other obsessions as well, Judge. We made obsessions that no one else heard the statement, that Mr. Russell's wife was with him at the dealership, but she wasn't there at the time. None of that is what you've argued in your brief here. That is not correct. What we're saying is that that ruling, there is no—it's applying the improper legal standard is what we're saying now in our briefs. Because there was no coercion or possibility of coercion or restraint on fair labor and acts, there could be no unlawful surveillance violation. But my point is that seems to be different than the argument you made in your exceptions. Than one of them, yes. Did you raise it in any of your exceptions? As far as the improper legal standard? Yes. Then no. Now, regarding the toolbox removals, under the board's ruling, and Judge Emanuel—excuse me, Member Emanuel cited concrete pipe. We are allowed to remove the toolboxes of the strikers if they do strike. It's only a violation if we remove them because of a strike. And here is where the board's logic falls apart. The board says, we know that you removed the—and I see my time is up. Finish one sentence. Okay. And the board says, I know that you removed the toolboxes from the Neapolitan store because they struck. We know this because your other six uses that struck on the same day, you did not remove those. But that logic falls flat, considering that the board, in its ruling and its brief, ignores the 731 meeting that Mr. Ranello had with the technicians prior to the strike where he says, we all know that the NCDC is going to strike tomorrow. We're not a part of the NCDC. I'm asking you, are you going to strike with them, or do you want to take advantage of this opportunity to make as much money as you want? We'll let you come in early. We'll let you stay late. We'll funnel in business from one of our Cadillac dealerships that's a part of the NCDC, and you can make as much money as you want. When Mr. Ranello asked them, are you with me? They said, yes, yes, that sounds great. When we showed up the next day, we were shocked to know, to find out that they did not show up and they were on strike. We didn't remove the toolboxes because they struck. If that was the case, we would have removed the toolboxes from all seven of the dealerships that went on strike. Okay, I think we understand your argument. I'll give you a couple minutes for rebuttal. Okay, thank you. May it please the Court, Jared Cantor, on behalf of the National Labor Relations Board. Your Honors, for Napleton to prevail here, it's asking this Court to blink away the credited, undisputed evidence. It's asking the Court to blink away the Board's reasoned analysis, which, as we point out in our brief,  is undisputed and unchallenged, and sometimes only belatedly in the reply brief. And I think, certainly, respectfully submitted, it's shown by Napleton opening argument today, talking about the procedural, not that there's side issues, but the horse and cart are kind of reversed, if really the layoff and discharge are what is so upsetting to them. Certainly, I'm prepared to discuss those, and if Your Honors have questions, otherwise I will respond to the procedural claims that they have opened with. Where in the Wal-Mart decision or the case handling manual does the ALJ get the discretion to decide whether to allow them to keep the affidavits until the end of the hearing? Well, Your Honor, that comes from both the Board's rule and then the case handling manual. So these are confidential witness statements. These are normally things that are not shown. They are shown for the limited purpose of cross-examination, and the Board's case handling manual, which I'll make two points about, talks about that they may be permitted to retain them if there's a legitimate trial purpose. Counsel talks about Napleton, and it talks about a footnote in Wal-Mart. I'm reading from the manual, 103-94.9. If counsel for the respondent desires, which they did here, respondent may be permitted to retain the affidavits until the hearing is closed, provided that they are retained for legitimate trial purposes. That's not the manual, Your Honor. That's the language that they are quoting from footnote 3 in Wal-Mart, which is language from 1970. Did it change?  Yes. The language that we quote in our brief is the language that wasn't affected this hearing. So we cite that in our brief. In their reply brief, Napleton says, you're wrong to rely on this. It's from 2019. The most recent version— Can you read— What page on your brief are you talking about? Let me pull up my— This would be page—starting at page 50. 50 to 51, we cite the language that wasn't affected this hearing. We cite the claim— Respondent may be permitted to retain the affidavits until the hearing is closed, provided that they are retained for legitimate trial purposes. That's what I just read to you. May be permitted. Sorry, Your Honor. I thought you had the if he so desires. That language is not in the case handling manual. Okay. So— That was the prior language. It used to be per the footnote 3 in Wal-Mart, which is citing—and that language was if he so desires, counsel may retain it. That language was changed at some point to the language that was in effect in this hearing. We cite the—and this is a point they make in the reply brief. We cite the most recent version of the case handling manual, which is 2019. I thought it said if counsel for respondent desires now. Does it not say that? The case handling manual? The one that you're talking about. No, it does not. Does it not say if counsel for respondent desires? Yes. Yes, it asks for. Okay. Yes. But the may be permitted. So they have to ask for it, Your Honor. So the language hasn't changed. The old version, and that's what's indicated on the cover sheet that says what's changed, if counsel for respondent desires, respondent may be permitted to retain the affidavits until the hearing is closed, provided they are retained for legitimate trial purposes. Yes. May be. That's the current language? If counsel for respondent, the respondent desires, counsel may be permitted to retain the affidavits until the hearing is closed, provided that they are retained correct. That's the exact same language other than maybe it says counsel rather than respondent from the old manual. So it hasn't changed in any substantive way. I'll pull the footnote. I'm just, here's the language from the prior manual that they rely on, that Wal-Mart had. If counsel for the respondent desires, is that the same? Yes. Respondent may be permitted. Is that the same where it says counsel may be permitted? Respondent may be, yes. May be permitted to retain the affidavits until the hearing is closed, provided they are retained for legitimate trial purposes. Yes. Sounds like the language hasn't changed at all. Well, the parts there have changed. What parts? Well, they're switching to counsel to respondent. Okay. That doesn't matter. No. Certainly, the key point is that the case handling manual in effect at the time is the one that we cited in the brief, not the footnote. Okay. So maybe they cited the wrong one, but if the language is the same, why does that matter? Well, all that matters is the may be permitted part. And this is the prejudice argument that at the hearing, counsel was insisting, citing Wal-Mart, that he had the right to retain these throughout the hearing. Is there any dispute that they wanted to retain them for legitimate trial purposes? Well, they never said why they wanted to, Your Honor. They asserted that they had a right to. And certainly, the rule is, yes, if they desire. So they have the option to ask for it, because the normal rule is that they do not. What was the ALJ's rationale for not allowing them to retain them? He said that that was not his normal practice, to let them keep it throughout. And I believe he also said, if something comes up, you can ask for them. And that's what the board pointed out here in a footnote citing its decision in Naperville, that there's nothing preventing them from asking them again. Well, it's hard to know when you want to ask if you don't have the information in front of you. Well, Your Honor, they got to, counsel gets to review these before they cross-examine a witness. They did get to review if they asked for any of them. That's standard. There's no dispute, or at least they're certainly not claiming that there are any. They were denied the ability to review. And certainly, you look at these things, you look at them in light of the direct examination that just went on. And certainly, in my years at the board, often people then, when they go to cross-examination, they're doing it for the purpose of impeaching a witness because the testimony changed from their affidavit to the hearing. But in this case, they did not explain, and they certainly have not made any prejudice argument in their opening brief or in their reply brief, what the prejudice was not getting to retain these throughout. And again, at the hearing, much like the sequester issue, they were asserting some type of a right to something, but not making any type of showing, even a bare minimum of explaining what the purpose was. Can I switch direction a little bit? Absolutely. So, I'm interested in what the board says, what you say in your brief here on page 26, about the mass discharge context, right? So, right-lying requires that the board demonstrate an employer had knowledge of the employee's union activity. And the exception to that is in the mass layoff context. But here, the board suggests that that principle is not cabined to cases involving numerous discriminaties. Can you cite to any cases that support that principle? No, Your Honor. I was not able to uncover a situation exactly like the one at Barr. So, then, is it the board's position that this is a mass layoff context? No, Your Honor. It's that the principle that the board relies on in those cases is also applicable here, where you have... It seems to me that all of the board's cases and our precedent in Davis supermarkets suggest that a mass layoff is a necessary precondition in order to eliminate the knowledge problem of right-lying. Well, Your Honor, right-lying is a test. And it's a test that the board uses in going after the fundamental question of whether protected activity was a motivating factor in an adverse employment action. And right-lying is a test that the board uses. Right. And has the board satisfied? Did the general counsel prove all of the elements of right-lying in this case? It doesn't seem to have. Well, it did, Your Honor, because the general counsel's theory of the case was that, based on these statements that had been made, that the motivating, unlawful motivation here was not individually what either of these men did, but it's that them, these technicians as a group... But then how does that fit within right-lying, which requires an employer's knowledge of each individual's union activity? Well, Your Honor, that is understandable in a case where the adverse action is predicated, the theory of the case is it's predicated on what that specific employee did. So certainly in a very traditional right-lying case based all on circumstantial evidence, we don't have the admissions that we have here. Two days after the election, Bob is called and is told, you're being let go, and maybe he's given a reason. Your performance has been unsatisfactory. The general counsel, in building his case in front of the board, is then going to have to show, well, Bob was engaged in union activity. He's going to have to show the employer knew about that, and he's going to have to show some type of animus, whatever his case is going to be. Here, the general counsel's theory was based on the evidence. And then certainly at this point, the question just is whether substantial evidence supports the board's finding of unlawful motivation. That's not my question. My question is whether the board applied its precedents in a consistent manner. Yes, Your Honor, I respectfully, yes. This is certainly a unique case. It's very novel. It would be, from my perspective, wonderful if all of my right-line cases had undisputed statements. Basically, you know, for Geisler, the board talks about that this is a veritable admission of that his layoff was unlawfully motivated. And certainly, you know, canvassing discharges broadly. You know, Your Honor, there are cases which are sometimes known as black sheep, white sheep, where an employer, in order to get rid of the union adherence, discharges people who had no union activity or who might have been against the union. But they are still protected by the act. Well, this mass layoff issue, was there a prior board precedent that said you don't have to show individualized, knowledge of individual activity only in mass layoff situations? Or in what you call black-white? Had they said the principle is limited to those two situations? No, Your Honor. I'm not aware of any case where the board has said what Your Honor is describing it that way. It certainly, as I just said to Judge Routt, this is novel in the way that it is described. You can't cite any cases where they have applied it outside of the mass layoff context, either, this principle. Correct, Your Honor. I mean, this case stands somewhat unique. And respectfully, again, I would love to have a case where we have these direct type of admissions of unlawful motivation that are credited and undisputed as we stand in the Court of Appeals. And I think, you know, to blink away that evidence. You know, if I might just conclude, as the board points out in cases like Tito and Print Fulfillment, often when you have those type of admissions, you don't even apply right-line. But in Tito, it was also obvious that there was a mass layoff situation. You still haven't cited a case where there wasn't a mass layoff. Correct, Your Honor. And certainly in mass layoff cases, you don't always have admissions. And you don't think this is a – you're not suggesting this was a mass layoff here?  No, Your Honor. It's the principle that underlies it there, that you can – an employer can violate the act by discharging someone where that discharge is motivated. I understand that principle. I just don't see where it's consistent with the precedents. Unless there – I'm over time. Unless there are any further questions. Thank you, Your Honor. Thank you. Mr. Kim, two minutes. Two minutes. Thank you, Judge Millett. Judge Millett, just two things. To address your first – the Walmart question case on the case handling manual you asked opposing counsel here. That manual that counsel was discussing, that was published in January or – I'm not sure. Excuse me. I'm not sure if it was January. But it was published in 2019. The board entered its decision on September 28th, 2018. So whatever manual he's talking about didn't even apply at the time when the board made its hearing. Secondly, as a case manual, it has no bearing. It doesn't overrule Walmart. And as you pointed out, the language is still the same as far as counsel has the discretion whether to keep the affidavits throughout the hearing. Now, going to the mass layoff issue here, Judge Rouse, you pointed out there are two buckets. There's the right-right, whether we knew that the employees, Russell and Geisler, were up to union activities and we terminated them because of that. Or the second, the exception, the right-client exception under the mass layoff. It has to be either or. Why? Why would the National Labor Relations Act, why would Section 88.3 want to allow employers to engage in retaliatory firings as long as it's not done en masse? I'm sorry, Judge Millett. Why would Section 88.3 allow employers to engage in admittedly retaliatory firings as long as they don't do it en masse? Well, first, we will disagree that it's a retaliatory firing. I'm asking you the legal question. Sure. I'm not talking about this case in particular. I'm talking about the legal principle. Why would Section 88.3 allow an employer to engage in admittedly retaliatory firings as long as they don't do it en masse? It's just three or four people. Well, it would have to be a mass layoff. Why? Because we would have to know whether they were involved in a union or not. If we were setting an example to the other folks and saying, you better not conduct this pro-union activity because you've seen me laid off your friends or your colleagues, it would have to be on a mass scale. Why? So that is not our test. Why? You pick a few popular employees. Right, but that is not. You fire them. Well, I understand your question. Everyone knows what's going on. Sure, Judge. But under your hypothetical, respectfully, that is not the test that the Board has set forth in the white line. And it's frankly not the test that this Court has followed. No, I'm asking you why Section 88.3. The Board, the other cases have involved not all of them, actually, but most of them have involved mass layoffs. Sure. Or the black sheep, white sheep. But I'm trying to, they haven't said only in these circumstances. Well, those cases have said either it's in a mass layoff where we didn't have to know whether they were pro-union or conducted pro-union activities, or we would have to do it under the straight right line test, whether we would actually have to know whether they were pro-union or conducted. Where did the Board say, you say the Board is being inconsistent. Where have they said that if it's not a mass layoff or firing, it's just a small number of targeted layoffs or firings, we must march through white line. Where have they said that? Well, that's the thing, Judge. There is no third bucket, as you're trying to say. So they haven't said there's none. Right. Well, what I'm saying is that. They haven't said either way until this case. No, it is either way. What I'm saying is that bucket just does not exist. That third bucket, that second obsection, this just doesn't exist. If there was a prior case where they had found retaliatory firing applying the same text, where only three employees were fired, then there would be no inconsistency. But that would have to be a mass layoff. Isn't that third bucket precluded by the terms of right line? It is, Judge. You're absolutely right. A right line gives two tests, whether it's a straightforward one, as you said, that we would know, or it's either that or the mass layoff where we didn't know where we conducted a mass layoff. The terminations of two employees is just not a mass layoff. So if you had a situation where there was an employee who, let's say, the record is undisputed that he was against the union, and he said, I don't want a union, I want to keep my job, I have a sick wife and kids, and I need this job, I need the insurance. And he was a very popular employee, and the union gets voted in, and the employer says the way to really hurt these guys is to terminate that employee, like this most vulnerable employee, because they brought in the union. And that's the undisputed record, that they fire that employee kind of as a way to, you know, hurt and embarrass and demoralize the workers who voted for the union. You don't think that violates 8A3? Not under the mass layoff. That would have to be a separate charge. And that's similar to the statement by Mr. Ingram. It wouldn't be a separate charge? If an 8A3 violation were charged, that wouldn't fit within the terms of that? As far as 8A3, there are many charges you could bring under an 8A3 charge, whether it's an unlawful surveillance charge, whether it's an unlawful termination charge, or it's a disciplinary charge. It would just have to be separate. It couldn't be an unlawful termination if we did not know, in your hypothetical, Judge Wilkins, that we knew that he was not pro-union and we still terminated him. I guess a similar example of that is the one violation which we did not accept and which did not appeal was Mr. Inman's statement to Geiser where he says, I'm sorry, you got laid off. It's because we brought the union. That was a separate charge. But that does not take away the board's burden to establish the prima facie case under white line, either under the straightforward test or the mass layoff test. They just have not done that. So just so that I'm clear, your answer to whether that would be an unlawful termination, my hypo, where they say they brought in the union and we think that the way that we can best kind of punish them or teach them a lesson is to fire this innocent guy who's going to lose his job and his insurance and his kids and his wife are sick. But that will teach them a lesson. We'll fire that guy. And we won't even be able to be, you know, a charge because that guy was, you know, against the union. So this is perfect. We can fire that guy, use him as a scapegoat, and we'll never suffer any repercussions. Do you think that's the way the act is supposed to work? Judge, I would agree that under your circumstance that would have to be a separate charge. It couldn't be under the straight line. I just don't understand what you mean by a separate charge. So it wouldn't fall under the two charges under the right line here as far as under the mass layoff theory or the straight right line. It would have to be a certain violation as far as you laid this person off because of the pro-union activities in general. But it would be an 83 violation. I would assume it would fall under that. As far as I apologize, Judge Wilkins, in your hypothetical, it's not something I was thinking about. I haven't conceptualized it. But as far as under the theories that the board brought, it falls into two buckets, and they've not met the prima facie burden on her either. So I apologize that I can't. When you say their theory, did their theory, did they charge you? They didn't charge you with a mass layoff. Well, that was their charge. A mass layoff? Yeah, that was stated by the ALJ in JA-24. If you look at that, JA-24, I believe it's footnote 20. Every single case of those are mass layoff cases. No, they may be mass layoff cases. I'm just talking about the charge. Was the charge here an 8A3 violation or was it a mass layoff? Was it a mass layoff 8A3 or discrimination under 8A3? I'm sorry. I butted into your comment. I'm just, I want to understand what you mean by that they charged a mass layoff here. Well, that was their theory. This was a mass layoff. Well, that was their theory. Their theory was not a straightforward right-line test as far as, you know that Russell and Geist were pro-union. I get that they weren't doing a straight right-line. What I'm asking is were they doing what Judge Wilkins hypothesized? How do we know they weren't doing what he hypothesized, that it was just discrimination because of union activity? That's just not in the record. That's not part of the charge. When you say that's not part of the charge, I guess I'm misstating it. So that would have to be part of the prima facie case as far as the mass layoff. That's still part of their burden. They would have to prove, the Board has to prove that we conducted a mass layoff under this alternative or exception under right-line. But you just said that it would violate 8A3 even if it wasn't a mass layoff. Well, in Judge Wilkins' hypothetical, I would imagine it would be a separate charge. It would not be the charge that the Board brought against us in this case. And that's why I'm trying to understand what you mean by the charge. I know that they cited mass layoff cases for this principle. But did the charge say you engaged in a mass layoff? Or did it just say you engaged in a discriminatory firing? It was a discriminatory firing, but that falls under the bucket of the mass layoff because it's either or. It's either the straight right-line test or Well, what I'm saying under Judge Wilkins' scenario, I would imagine, I'm picturing a complaint, and I'm looking at the allegations of a complaint, and I see count one, straight right-line, count two under Judge Wilkins' scenario, it's a different charge. That charge was not brought against us, Your Honor. The charge against us was kind of an ambiguous charge that falls into the mass layoff bucket, not the straight right-line bucket. Do you have the complaint, the general counsel's complaint in the right-line? I have it with me, yes. Is it in the JA? Sorry. I believe so. Can you tell me what page? I can't tell you off the top of my head. I can take a look. I'd be grateful if you would. Thank you. Judge, my counsel told me to look at JA 274, please. Okay. Got it. Okay. Thank you very much. Thank you, Judge. Any questions? Okay. Thank you all. The case is submitted.
judges: Millett, Wilkins, Rao